[No. 15777-2-II.   Division Two.   June 2, 1994.]

CHRISTINE LAURITZEN, *Appellant,* v. BRET LAURITZEN, *Respondent.*

434

*Stanley J. Rumbaugh* and *Rumbaugh & Rideout,* for appellant.

*David M. Jacobi* and *Wilson, Smith, Cochran & Dickerson,* for respondent.

ALEXANDER, J. — Christine Lauritzen (Christine) appeals an order of the Pierce County Superior Court granting a summary judgment in favor of her husband, Bret Lauritzen (Bret). She contends that the trial court erred in concluding, as a matter of law, that Bret, the driver of a vehicle in which she was riding as a passenger when she was injured by a third party, had no legal duty to protect her from the foreseeable criminal acts of that third party. We affirm.

On January 7, 1990, the Lauritzens, residents of Puyallup, arrived in Miami, Florida, for several days of vacation, after spending a week vacationing on Grand Cayman in the Cayman Islands.[1] The Lauritzens had been warned by friends and relatives "to be careful" in Miami because it was "different" from Grand Cayman. They were also warned to "watch [their] back all the time, that there are certain areas to stay out of" including areas "along the beachfront". When they arrived at their hotel in Miami, they found a pamphlet in their room that warned visitors to take various security measures, including locking doors and identifying people before opening the door. Christine also observed that there were "three deadbolts on the door and cameras around".

---

[1]The facts of this case are not disputed. For the purposes of summary judgment, Bret accepts Christine's statement of the facts.

On the day following their arrival in Miami, Bret and Christine drove into "Miami City" in order to do some shopping. As they left a store late in the day, an employee told them "to hurry up and get to [their] car because it got quite dangerous when the police kind of get ready and leave". The store employee also told them to "be careful[,] get to you[r] car[,] and get out of here". Christine observed that this area of the city was "a very bad area to be after dark".

The Lauritzens reached their car safely. As they departed the parking lot between 6:45 and 7 p.m., Bret asked the parking attendant about the best route to return to the freeway that would take them to their hotel in the "[Miami] beach area". The attendant told Bret that "it's real easy. . . . when you get out of here, take the left, and you'll hit the on-ramp right there". Bret left the parking lot and turned right, telling Christine, "I'm going my own way home. . . . I'm going to take the scenic route".

They soon became lost, and Bret became angry. Whenever Christine tried to give directions, Bret told her to "shut [her] mouth". At one point they drove by a police station, and Christine suggested that they stop and ask directions. Bret refused. Christine also suggested that they go back to the parking lot and follow the parking attendant's directions. Bret again refused. Although Bret had a map on his lap as he was driving, he would not let Christine examine it. After driving for approximately 45 minutes to 1 hour, they arrived, according to Christine, in "a very ugly part of town".

Bret finally pulled into the parking lot of a convenience store in order to examine his map with better light. The Lauritzens remained in the vehicle. Approximately 5 minutes later, Christine, while looking through the mirror on her side, saw a person "kind of crouch down, coming around the car". She screamed, and a rock crashed through the window. The unidentified assailant then reached into the car and grabbed a shopping bag that was lying on the floor of the car. Bret "put the car in drive and took off". As they sped away, Bret asked her if she was shot. Christine

answered that she "didn't know, and . . . wasn't going to look because [she] felt real f[a]int".

Bret eventually pulled the car into a gas station, where he called the police. It was later discovered that Christine had been injured by flying glass from the shattered window.

Christine thereafter filed a complaint in Pierce County Superior Court against Bret, generally alleging that Bret was negligent in failing to adequately protect her safety in that he placed her in the danger that ultimately resulted in her being injured. Bret denied liability and moved for summary judgment, contending that, under the circumstances, he had no legal duty to protect his wife from the criminal acts of third parties. In support of his motion, Bret submitted Christine's complaint and excerpts from her deposition. In opposition to the motion, Christine submitted additional excerpts from her deposition. The trial court granted Bret's motion, concluding that Bret owed Christine no legal duty under the circumstances.

Following Christine's appeal to this court, we requested additional briefing on the question of which law should apply, Washington's or Florida's.

I

Bret contends that the trial court should have applied Florida law, which he claims would bar this action pursuant to Florida's interspousal immunity doctrine. Christine asserts that the trial court properly applied Washington law to the merits of the case.

■ In any conflict of laws case, our first task is to determine if an actual conflict of laws exists. "An actual conflict between the law of Washington and the law of another state must be shown to exist before Washington courts will engage in a conflict of law analysis." *Burnside v. Simpson Paper Co.*, 123 Wn.2d 93, 103, 864 P.2d 937 (1994); *International Tracers of Am. v. Estate of Hard*, 89 Wn.2d 140, 144, 570 P.2d 131 (1977), *appeal dismissed*, 435 U.S. 1004 (1978). If the laws and interests of the concerned states are not in conflict the result is deemed a "false" conflict or no conflict at all. *Burnside*, at 100 n.3; *see* Robert A. Leflar et al., *American Conflicts Law* §

92, at 270-73 (4th ed. 1986). In the absence of a conflict, the forum is free to apply its own law. *Burnside*, at 104.

We are persuaded that no conflict exists between Florida law and Washington law. The doctrine of interspousal immunity has been abolished in both states. *See Freehe v. Freehe*, 81 Wn.2d 183, 192, 500 P.2d 771 (1972); *Waite v. Waite*, 618 So. 2d 1360, 1361 (Fla. 1993) ("[W]e now find that there no longer is a sufficient reason warranting a continued adherence to the doctrine of interspousal immunity. . . . [B]oth public necessity and fundamental rights require judicial abrogation of the doctrine.").[2] Thus, it is unnecessary for us to engage in a conflict of laws analysis of the laws and policies of the two states and we will simply apply Washington law in determining the issues presented by this appeal.

## II

Christine contends that the trial court erred in concluding, on summary judgment, that Bret, as the driver of a vehicle, owed no legal duty to Christine, as a passenger, to protect her from foreseeable criminal acts of an unknown third party. Bret asserts that such a duty has never been recognized under Washington law, and that we should decline to recognize one now.

■■ Summary judgment is properly granted when the pleadings, affidavits, depositions and admissions on file demonstrate that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. CR 56(c); *Kesinger v. Logan*, 113 Wn.2d 320, 325, 779 P.2d 263 (1989). All facts and reasonable inferences must be considered in the light most favorable to the non-moving party, and summary judgment should be granted only if, given all of the evidence, reasonable persons could reach but one conclusion. *Scott v. Pacific W. Mt. Resort*, 119 Wn.2d 484, 502-03, 834 P.2d 6 (1992); *Kesinger*, at 325. The burden is on the moving party to demonstrate that there is no issue of material fact. *Scott*, at 503. We review a trial court's grant of summary judgment de novo, and engage in

---

[2]At the time we requested additional briefing, Florida recognized the doctrine of interspousal immunity.

the same inquiry as the trial court. *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982).

■■ In order to prove actionable negligence, a plaintiff must establish: (1) the existence of a duty owed to the complaining party; (2) a breach of that duty; (3) injury; and (4) that the claimed breach was a proximate cause of the resulting injury. *Hansen v. Friend*, 118 Wn.2d 476, 479, 824 P.2d 483 (1992); *Pedroza v. Bryant*, 101 Wn.2d 226, 228, 677 P.2d 166 (1984). A threshold question in any negligence case is whether the defendant owed a duty of care to the plaintiff. Whether a defendant owes a duty of care to a plaintiff is a question of law. *Hansen*, at 479; *Pedroza*, at 228. Absent a duty of care, a defendant is not subject to liability for negligent conduct.

■ Under the common law "a private person does not have a duty to protect others from the criminal acts of third parties". *Hutchins v. 1001 Fourth Ave. Assocs.*, 116 Wn.2d 217, 223, 802 P.2d 1360 (1991); *see* E.L. Kellett, Annotation, *Comment Note — Private Person's Duty and Liability for Failure To Protect Another Against Criminal Attack by Third Person*, 10 A.L.R.3d 619 § 3 (1966) (hereinafter Annot., *Duty and Liability*) (collecting cases). Washington has recognized an exception to this general rule in cases where "a special relationship exists between the defendant and either the third party or the foreseeable victim of the third party's conduct". *Hutchins*, at 227 (quoting *Petersen v. State*, 100 Wn.2d 421, 426, 671 P.2d 230 (1983)).

The "special relationship" that triggers a duty of care is described in the Restatement (Second) of Torts § 315 (1965), which provides as follows:

> There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless
>
> (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
>
> (b) a special relation exists between the actor and the other which gives to the other a right to protection.

*Petersen*, 100 Wn.2d at 426 (quoting with approval Restatement (Second) of Torts § 315 (1965)).

Both Bret and Christine concede that there was no special relationship between the unknown assailant and Bret to warrant the imposition of a legal duty under subsection (a). Despite this concession, Christine relies in part on *Petersen*, at 428, where our Supreme Court held that a psychiatrist had a duty to take reasonable precautions to protect foreseeable victims from the criminal acts of the psychiatrist's patient because of the special relationship between the psychiatrist and the patient under § 315(a). This holding has no applicability to our analysis as to whether a duty exists here under subsection (b) because, as we have noted, Christine did not allege a special relationship between Bret and the criminal actor.

Christine contends that under § 315(b) of the Restatement, a special relationship existed between Christine and Bret, not as husband and wife, but as driver and passenger, that gave rise to a legal duty on the part of Bret to afford her "a right to protection". She asks us to recognize this special relationship under Washington law.

■■ Those relationships between a defendant and a foreseeable victim that have been previously recognized by Washington courts as "special", and, therefore, giving rise to a legal duty to protect the victim from foreseeable criminal acts of third parties, have been described as "protective in nature, historically involving an affirmative duty to render aid". *Hutchins*, at 228; *see* W. Page Keeton et al., *Prosser and Keeton on Torts* § 56, at 383 (5th ed. 1984) (hereafter *Prosser & Keeton*). Examples of special relationships include: a school district toward a pupil, *McLeod v. Grant Cy. Sch. Dist. 128*, 42 Wn.2d 316, 319-22, 255 P.2d 360 (1953); an innkeeper to his or her guests, *Miller v. Staton*, 58 Wn.2d 879, 883, 365 P.2d 333 (1961) (duty of innkeeper to protect guests from criminal activity of other guests); a common carrier to its passengers, *Hutchins*, at 228;[3] an employer to his or her employees,

---

[3]Although the relationship between a common carrier and a passenger is an example of a special relationship, *Hutchins*, at 228, the two cases cited by Christine regarding this relationship are not on point. *Zorotovich v. Washington Toll Bridge Auth.*, 80 Wn.2d 106, 491 P.2d 1295 (1971) did not involve the criminal

*Bartlett v. Hantover*, 9 Wn. App. 614, 621, 513 P.2d 844 (1973) ("employer has a duty to make reasonable provision against foreseeable dangers of criminal misconduct to which the employment exposes the employee"), *rev'd in part on other grounds*, 84 Wn.2d 426, 526 P.2d 1217 (1974); a hospital to its patients; and a business establishment toward its customers. *See Hutchins*, at 228 (citing examples from *Prosser & Keeton* § 56, at 383).

In all of the above, the special relationship involved situations where one party was, in some sense, entrusted with the well being of another. The entrustment aspect is what appears to us to underlie the imposition of the additional duty to protect someone from foreseeable criminal acts of third parties. Christine asks us to recognize a new special relationship that would trigger a legal duty — namely, the relationship between an automobile driver and his or her passenger. She does not cite, nor have we been able to locate, a decision of any court that recognizes such a "special relationship".

There are admittedly some similarities between a driver/passenger relationship and those "special relationships" that have been recognized previously by Washington courts. The driver of an automobile, like an employer, innkeeper, or common carrier, has substantially more control over the place where the incident occurred and the activities in and around that place than does the subordinate passenger. Furthermore, the passenger has no ability to direct the vehicle, and no ability to exit the vehicle while it is in motion. The major difference, however, is that in all the situations where a special relationship has been recognized, the party that has been found to have a legal duty was in a position to provide protection from foreseeable criminal acts of third parties because he or she had control over access to the premises

---

act of a third party, it involved a general duty of care on the part of common carriers. *Kenny v. Southeastern Pa. Transp. Auth.*, 581 F.2d 351 (3d Cir. 1978), *cert. denied*, 439 U.S. 1073 (1979) involved the question of premises liability under Restatement (Second) of Torts § 344 (1965) and the foreseeability of criminal activity.

that he or she was obliged to protect. Employers and innkeepers, as we have noted above, are obliged to provide some protection to employees and guests on their premises. The same rationale applies to schools, hospitals, business establishments, and common carriers.

Drivers of passenger vehicles and passengers do not appear to be in the same situation. A driver of a car clearly is not in control of the surrounding streets and highways or the conduct of other persons using those streets or highways. It is difficult to imagine what reasonable precautions a driver could take, beyond locking doors, to control access to a vehicle while, for instance, it is stopped at a traffic light or parked in a parking lot.[4]

Furthermore, most of the existing special relationships involve situations where the prospective defendant (employer, innkeeper, business owner) is benefiting financially from the prospective plaintiff (employee, guest, business invitee). *See* Annot., *Duty and Liability* § 2, at 625. There is ordinarily no such financial relationship between driver and passenger. Finally, there is no historic duty on the part of a driver to render aid to a passenger. *See Hutchins*, at 228.

In at least one special relationship recognized in Washington, the scope of the duty to protect someone against the criminal acts of a third party has been limited somewhat. Innkeepers are responsible only for protecting their guests from the criminal acts of other guests. *Miller*, at 883. If a duty on the part of a driver to protect a passenger from criminal acts of a third party is eventually recognized, it should be similarly narrow.[5] For instance, there may be an argument for

---

[4]Although it could be argued that a driver's duty in protecting a passenger would be to avoid driving his or her "premises", *i.e.*, vehicle, into an area where criminal activity is likely, we reject this argument. An individual's freedom to drive his or her vehicle freely throughout the state should not be restricted in this way.

[5]Drivers do owe, of course, a duty to exercise due care for the safety of passengers in the operation and maintenance of their vehicle. *Roberts v. Johnson*, 91 Wn.2d 182, 588 P.2d 201 (1978). However, this duty is not analogous to the "special relationship" that affords protection against the foreseeable criminal acts of third parties.

a "special relationship" giving rise to a legal duty on the part of a driver to protect a passenger against foreseeable criminal acts by *other passengers*. That would be consistent with the aforementioned duty of an innkeeper to protect guests from the criminal acts of other guests. *See Waldron v. Hammond*, 71 Wn.2d 361, 363, 428 P.2d 589 (1967); *Miller*, at 883. Christine asks us to define a broader duty.

If we were to require a driver to protect his or her passenger from foreseeable criminal acts of third parties we would be requiring more of that person than we do of other persons in the "special relationships" that have previously been recognized in Washington. Even if we were to view the driver's automobile as his or her "premises", the duty would necessarily extend beyond the reach of the vehicle itself given the inherent mobility of an automobile. Given the unfortunate fact of pervasive crime and violence in many urban areas, drivers could, if we were to adopt Christine's position, be held liable for merely driving in an urban area at night, because criminal acts are certainly foreseeable in such areas. We are not inclined to impose such a duty.

Christine further asks us to recognize a special relationship between an automobile driver and a passenger based on a balancing of public policies. She relies on *Roberts v. Pinkins*, 171 Mich. App. 648, 430 N.W.2d 808 (1988), a case decided by the Michigan Court of Appeals, and a law review article, Gregory A. Crouse, Comment, *Negligence Liability for the Criminal Acts of Another*, 15 J. Marshall L. Rev. 459 (1982). The *Pinkins* court established a balance of interests to determine if a special relationship exists. "[T]he court must balance the societal interests involved, the severity of the risk, the burden upon the defendant, the likelihood of occurrence, and the relationship between the parties." *Pinkins*, at 652. Additional factors that contribute to the finding of a duty include the foreseeability of criminal activity, the defendant's ability to cope with the proposed duty, the victim's inability to protect himself or herself from criminal activity, the costs of providing protection, and whether the plaintiff bestowed some economic benefit on the

defendant. *See also* Annot., *Duty and Liability* § 2, at 624-25. For the reasons stated previously, we are persuaded that these factors weigh against imposing a duty on a driver.

## III

██ ██ Christine next cites the Restatement (Second) of Torts § 302B to support her claim that Bret owed her a duty. That section provides that, even absent a special relationship, there may be some situations where a duty arises to protect a person from the criminal acts of third parties.[6] However, § 302B recognizes a duty if "the defendant's property affords a special (or peculiar) temptation or opportunity for crime" or if the defendant's affirmative actions bring about a special "temptation or opportunity" for criminal conduct. *Hutchins*, at 230-32. Bret's vehicle did not, in our judgment, present a special temptation as it sat in the parking lot of a convenience store. Comment d to § 302B explains that a defendant may "proceed upon the assumption that others will obey the law". *Hutchins*, at 230. Bret did exactly that. He had no prior knowledge of specific criminal activity in the exact location where he parked the car. In *Hutchins*, the court found that this section of the Restatement did not apply to the owner of a building in which a person was attacked, observing that "[c]riminal conduct . . . is an unfortunate fact of urban life. . . . [and] if we were to hold to the contrary, we would essentially make urban land possessors the insurers of all those passing on public sidewalks or streets." *Hutchins*, at 232-33. The same logic applies to the facts of this case. No duty exists under § 302B.

## IV

In light of all the authorities noted above, we conclude that there was no "special relationship" between Bret Lauritzen, as a driver of a private passenger vehicle, and Christine Lauritzen, as his passenger, which gave rise to a

---

[6]Restatement (Second) of Torts § 302B provides: "[a]n act or an omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the conduct of the other or a third person which is intended to cause harm, even though such conduct is criminal."

duty on the part of Bret to protect her from the foreseeable criminal acts of third parties.[7]

Affirmed.

MORGAN, C.J., and SEINFELD, J., concur.

Review denied at 125 Wn. 2d 1006 (1994).

---

[7]In light of our conclusion that Bret owed no legal duty to Christine, we need not consider whether Christine could establish a breach of duty, or whether causation is present.