[No. 37971-2-I. Division One. January 26, 1998.]

JUANITA FUNKHOUSER, ET AL., *Appellants*, v. DAVID WILSON, ET AL., *Defendants*, DAVID SCHULZ, ET AL., *Respondents*.

*Stephen W. Hansen* and *Paul S. McConnell* of *Cornell, Hansen, Bugni & McConnell, P.S.*, for appellants.

*Lee Kraft*, for respondents Schulz and Calvary Baptist Church of Twisp.

*Joel T. Salmi*, for respondent Columbia Baptist Conference.

KENNEDY, A.C.J. — The three appellants, Juanita Funkhouser, Sheri Lewis and Janelle Larson, are sisters who were sexually abused by Orin Wilson when they were children. Wilson, who is now deceased, was a prominent member of Cavalry Baptist Church of Twisp, Washington who held various leadership positions within the church during the years that the sexual abuse took place, including but not limited to the positions of Church Youth Director, Sunday School Teacher, Director of Daily Vacation Bible School and Member of the Board of Deacons. The appellants' father, Lanny Barringer, was pastor of the church in Twisp when the abuse took place. Before Sheri and Janelle were molested, David Schulz, another prominent church member who held various leadership positions in the church at Twisp, learned that Wilson may have molested a child. He kept this information to himself, failing to warn Pastor Barringer that his daughters might be in danger of being molested by Wilson. Before Juanita was molested, additional information came to light by which local and regional church leaders were made aware that Wilson had molested his granddaughter. They learned this information while Pastor Barringer was out of state. Upon his return, Pastor Barringer was not told about Wilson's disposition to molest children. As had been the case with the older girls, Wilson was given free access to Juanita and he molested her. In their complaint, the appellants alleged that Orin Wilson had molested them when they were children and that the other defendants negligently failed to protect them from the sexual abuse despite knowing that Wilson had a disposition to sexually molest children. The trial court dismissed Sheri's and Janelle's claims against Schulz and Calvary Baptist Church of Twisp on summary judgment, concluding that neither Schulz nor the church owed a duty to protect them from sexual abuse by Wilson. In a separate ruling, the trial court dismissed Juanita's claims against Schulz, Calvary Baptist Church of Twisp and Columbia Baptist Conference, concluding that the statute of limitations had run on her claims against them. We reverse both summary judgments and remand for a trial on the merits

or such other disposition as shall be consistent with this opinion.[1]

## FACTS

Consistent with the standard of review of summary judgments, we recount the facts in the light most favorable to the appellants. Sheri Lewis, Janelle Larson and Juanita Funkhouser are sisters whose father, Lanny Barringer, was pastor of Calvary Baptist Church of Twisp during some of their childhood years. Between 1969 and 1973, the two older daughters, Sheri and Janelle, were sexually abused by Orin Wilson, a prominent church member who held multiple leadership positions in the church, including but not limited to membership on the Board of Deacons, Youth Director, Director of Daily Vacation Bible School, and Sunday School Teacher. In 1968, before the Barringer family moved to Twisp, David Schulz, another prominent church member who also held multiple leadership positions in the church during the relevant years, including Chairman of the Board of Deacons, Youth Director, Youth Sponsor, and various positions in the Sunday School Department, had been doing volunteer carpentry work at the church when the church secretary asked him to take a phone call. The caller, a woman, had asked to speak with someone in a position of authority at the church. Schulz did not know the caller, but she identified herself to Schulz by name. Although the exact content of the telephone conversation is disputed, a rational trier of fact could conclude, from Schulz's subsequent varying descriptions of the content of the call and of his reaction to it, that the woman told Schulz that Wilson had molested a child. The trier of fact could also infer that the purpose of her call was to warn someone in a position of authority at the church in Twisp that Wilson might pose a danger to children in the congregation. Schulz advised the woman to file

---

[1]Appellants' claims against Orin Wilson's estate and against his widow, which the trial court refused to dismiss on summary judgment, are not at issue in this appeal.

charges with the legal authorities if the charges were as serious as she thought, and requested that she keep the church informed. He did not inform anyone of the woman's accusation at that time, nor for many years thereafter. However, he was concerned enough about what the woman had told him that he felt it was his duty as Youth Director to keep an eye on Wilson.

In 1974, Pastor Barringer moved with his family to Iowa to accept a pastor position there; he returned to the pastor position in Twisp in 1978. By that time, Sheri and Janelle had grown up and moved out of the family home; Juanita was about 11 years of age. During Pastor Barringer's absence, the replacement pastor, Dale Akker, received information from Orin Wilson's daughter-in-law that Wilson had sexually abused his granddaughter in 1974, and from the Okanogan County Sheriff that a warrant had been issued for Wilson's arrest on child molestation charges. Wilson's daughter-in-law later testified that she believed that she also told Schulz of Wilson's abuse of her daughter. Pastor Akker immediately called Jack Bergeson, Executive Minister of the Columbia Baptist Conference (CBC), the regional office for certain Baptist churches including the Twisp Church, and asked Bergeson what he thought he should do. Bergeson advised Akker to "let it be and see what happens in the future," gave Akker the name of a counselor for Wilson, and asked that Akker keep him informed. When Akker asked Bergeson whether Wilson should be removed from membership on the Board of Deacons, Bergeson stated to Akker, "Why hang your dirty wash out." Clerk's Papers at 768. Akker contacted Wilson and Wilson's wife regarding the charges against him and assisted Wilson in obtaining counseling. Neither Akker nor anyone at CBC ever informed any other person at the church in Twisp of Wilson's sexual abuse of his granddaughter. Pastor Akker left the Church several months before the Barringer family returned. From the time of the Barringer family's return to the church in Twisp in 1973 until 1980, Wilson repeatedly sexually abused Juanita.

The record reflects that Sheri and Janelle were abused

by Wilson in the Wilson home while he served ás their baby-sitter so that their parents could travel in accord with Pastor Barringer's responsibilities as church pastor. The record reflects that Schulz knew about the babysitting arrangement. The record reflects that Juanita was abused by Wilson both in Wilson's home and, on one occasion, on church property.

Plaintiffs filed this lawsuit in 1994. Because all of the acts of sexual abuse against Sheri and Janelle were alleged to have taken place before CBC learned of Wilson's history, Sheri and Janelle sued only Schulz and the Calvary Baptist Church of Twisp, whereas Juanita sued Schulz, the church and CBC. Sheri and Janelle alleged that prior to Wilson's sexual abuse of them, Schulz received information that Wilson was capable of, had a propensity toward, and a prior history of child sexual abuse but negligently failed to investigate in order to substantiate the accusation against him, or to prevent him from being installed in church leadership positions that gave Wilson unlimited access to and significant authority over children of the church; and that Schulz negligently and/or intentionally failed to warn their father and others in order that they might protect Sheri and Janelle from Wilson. Sheri and Janelle alleged that the church in Twisp negligently failed to protect them from abuse despite Schulz's knowledge of Wilson's history of abusing a child. Juanita alleged that Schulz, the church in Twisp and the CBC negligently failed to protect her from Wilson's sexual abuse despite knowing of his disposition to sexually abuse children.

Sheri and Janelle, who suppressed their memories of Wilson's abuse for many years, alleged that they discovered their injuries and some or all of the defendants' wrongful acts less than 3 years before they filed their lawsuit. Juanita, who suppressed her memory of the most serious of the incidents of abuse until she received counseling after her marriage, first told her father about Wilson's abuse in 1991, after she had received extensive counseling. Pastor Barringer then told Schulz about the abuse and asked

Schulz whether it was possible that Wilson had also molested Schulz's daughters. It was then that Schulz revealed, for the first time, the fact that he had received the telephone call from the woman in 1968. Pastor Barringer passed this information to his daughters. Shortly thereafter, Pastor Barringer and his daughters also learned, for the first time, that Pastor Akker and the CBC had become aware of Wilson's propensities before Juanita was molested by Wilson. The law suit was filed in 1994.

Schulz and Calvary Baptist Church of Twisp moved for summary judgment dismissing Sheri and Janelle's claims against them, contending that there were no grounds on which to impose a legal duty on them to protect Sheri and Janelle from abuse by Wilson; Schulz, the church in Twisp and CBC did not ask for dismissal of Juanita's claims on that ground, instead asking that her claims be dismissed only because the statute of limitations had run. In dismissing Sheri and Janelle's claims, the trial court stated that it could find no basis in Washington law for the existence of a duty owed by Schulz or Calvary Baptist Church of Twisp to those two plaintiffs. In so ruling, the court rejected the premise that the church had a sufficient special relationship with Wilson or the plaintiffs to give rise to a duty of protection of Sheri and Janelle from sexual abuse by Wilson, particularly with respect to conduct occurring off church premises and not during organized church activities. In dismissing Juanita's claim, the court ruled that: (1) the statutory discovery rule contained in RCW 4.16.340 did not apply to preserve her claims; and (2) under the common-law discovery rule, Juanita failed as a matter of law to exercise due diligence in discovering the basis for her claims against Schulz, Calvary Baptist Church of Twisp and CBC. The court denied Juanita's motion for reconsideration.

All three plaintiffs appeal.

## DISCUSSION

### I

Sheri and Janelle appeal the trial court's dismissal of their claims on the ground that defendants Schulz and Calvary Baptist Church of Twisp had no legal duty to protect them against Wilson's abuse. In reviewing a grant of summary judgment, the appellate court engages in the same inquiry as the trial court, and will affirm the judgment if, considering the facts in the light most favorable to the non-moving party, the record demonstrates that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982).

Summary judgment dismissal of negligence claims is proper if the defendant owed no duty to the plaintiff. *Hutchins v. 1001 Fourth Ave. Assocs.*, 116 Wn.2d 217, 220, 802 P.2d 1360 (1991); *Lauritzen v. Lauritzen*, 74 Wn. App. 432, 438, 874 P.2d 861 (1994). The existence of a duty is a question of law. *Lauritzen*, 74 Wn. App. at 438.

As a general rule, there is no legal duty to protect another from the criminal acts of a third person. *Hutchins*, 116 Wn.2d at 223. Exceptions to this general rule exist, however, in cases where: (1) a "special relationship" exists between the defendant and either the victim or the tort-feasor; or (2) the defendant acts or fails to act while knowing that doing so involves an unreasonable risk of harm to the plaintiff via the conduct of the tort-feasor. RESTATEMENT (SECOND) OF TORTS § 315, § 302B; *Hutchins*, 116 Wn.2d at 227-30.

### *"Special Relationship": Custodial or Protective*

A "special relationship" exists if either (a) a special relation exists between the defendant and the tort-feasor which

imposes a duty upon the defendant to control the tort-feasor's conduct, or (b) a special relation exists between the defendant and the victim which gives the victim a right to protection. RESTATEMENT (SECOND) OF TORTS § 315. Sheri' and Janelle's claims are based on both types of special relationships (as are Juanita's, but the defendants did not move for summary judgment on these same grounds with respect to Juanita).

The duty to control "will be imposed only upon a showing of a definite, established and continuing relationship between the defendant and the [tort-feasor]." *Honcoop v. State*, 111 Wn.2d 182, 193, 759 P.2d 1188 (1988). Cases in which such a duty has been established by the Washington Supreme Court have uniformly involved situations where the person charged with the duty of control has some sort of legal authority to control the tort-feasor's conduct. For example, in *Petersen*, a state-employed psychiatrist who had control over the medications that the tort-feasor was taking and who was in a position of authority to petition for the tort-feasor's commitment was found to have a legal duty based on the obligation to control the tort-feasor. *Petersen v. State*, 100 Wn.2d 421, 428, 671 P.2d 230 (1983). Similarly, in *Taggart*, a parole officer with the statutory ability to directly supervise the tort-feasor, a parolee, was found to have the custodial relationship described in § 315(a). *Taggart v. State*, 118 Wn.2d 195, 219, 822 P.2d 243 (1992). "[T]he relationship between employer and employee gives rise to a limited duty, owed by an employer to foreseeable victims, to prevent the tasks, premises, or instrumentalities entrusted to an employee from endangering others. This duty gives rise to causes of action for negligent hiring, retention and supervision." *Niece v. Elmview Group Home*, 131 Wn.2d 39, 48, 929 P.2d 420 (1997).

In *John Does v. CompCare, Inc.*, 52 Wn. App. 688, 763 P.2d 1237 (1988) the appellate court concluded that Washington acquired personal jurisdiction over the Diocese of Lafayette, Louisiana, and over three officials of the Roman Catholic Church who governed the Diocese, under the

long-arm statute based on tortious acts committed within this state. The Diocese placed one of its ordained priests at Jesuit House in Spokane after suspending the priest from his priestly duties in Louisiana when he admitted to sexual misconduct with minors in Louisiana. The Diocese also obtained treatment for the priest and paid for his support in Washington, either by a subsidy or a salary. One of the treatment providers warned the Diocese that the priest should not be permitted a ministry that involved work with adolescent boys. While residing at Jesuit House in Spokane, the priest obtained employment at Deaconess Medical Center in its treatment center for adolescent boys. The priest notified the Diocese of the fact of his employment but apparently not that he was working with adolescents. Soon, patients began to report sexual abuse by the priest. Several patients brought suit in Washington, alleging negligent failure to supervise and naming the Diocese and its governing officials as defendants. The Diocese then challenged the personal jurisdiction of the Washington courts. The plaintiffs argued that the Diocese committed tortious acts in Washington under RESTATEMENT (SECOND) OF TORTS § 315 based on a special relationship existing between the Diocese and the priest or the Diocese and the victims. In rejecting the Diocese's jurisdictional challenge, the court of appeals said:

> The Diocese's argument ignores the scope of the relationship which existed between the Diocese and its priest. The duty of obedience which [the priest] owed the Diocese encompassed all phases of his life and correspondingly the Diocese's authority over its cleric went beyond the customary employer/employee relationship. *See Code of Canon Law*, Canons 265, 273, 290, 1333, 1350, 1395 (1985). . . .
>
> Construing the evidence most favorably to plaintiffs . . . there is prima facie evidence to satisfy the statutory requirement of a "tortious act" and further conclude the causes of action are arguably related to the Diocese's placement and maintenance of its priest in Washington. However, the issue of whether the Diocese was in fact negligent in supervising [the priest] or whether it should have warned Deaconess . . . must be resolved by the trier of fact.

*CompCare*, 52 Wn. App. at 695.

In the instant matter, the Church Constitution and Covenant recites the obligations of church members and leaders to comply with the highest standards of behavior and deportment, including the obligation to nurture those under their care and to live exemplary lifestyles. Deacons are to be "men of dignity . . . beyond reproach." Clerk's Papers at 457. The pastor and deacons are charged with the responsibility of interviewing and disciplining members who violate their Christian obligations. The Constitution and Covenant contain provisions for formal disciplinary proceedings with procedural due process. Pastor Barringer stated in a declaration that the Deacon Board was expected to address issues concerning the welfare of the children in the church and to warn church members about dangers or risks presented by any church members who were "wayward or destructive in their actions (if such a situation were to arise)." Clerk's Papers at 372. Sheri and Janelle argue that Schulz and the church, by virtue of the Church Constitution and Covenant, voluntarily assumed a duty which included active intervention if one of the church members became a source of danger to other church members.

Sheri and Janelle do not contend, however, that church officials had the same degree of control over Wilson, under the Church Constitution and Covenant, as the Louisiana Diocese had over its errant priest by virtue of the CODE OF CANON LAW in *CompCare*. There, the Diocese had the authority to require the priest to leave Louisiana and reside at Jesuit House in Spokane, as well as to require treatment and to restrict the scope of the priest's ministry. Moreover, the Diocese paid the priest a salary or a subsidy, and paid for the cost of his treatment. The degree of control was much stronger than the usual employer-employee relationship would allow. Here, Wilson, as well as Schulz, was a volunteer who was not paid for his services to the church. Unlike *CompCare*, the degree of control over Wilson was weaker than the usual employer-employee relationship

would allow. Additionally, to the extent that the Constitution and Covenant and the statement of faith required of members of Calvary Baptist Church of Twisp can be analogized to the CODE OF CANON LAW and the vows of obedience made by a Catholic priest, before the disciplinary process contained in the Constitution and Covenant could be invoked the allegation of misconduct had to be in writing. The 1968 telephone call did not rise to the level of a formal, written charge of misconduct. We agree with the trial court that the evidence in this case falls short of the showing of control over the tort-feasor's conduct required by RESTATEMENT (SECOND) OF TORTS § 315(a).

But we disagree with the trial court with respect to the special relationship required by § 315(b), that giving rise to a victim's right of protection. The trial court expressly relied upon *Miller v. Everett*, 576 So. 2d 1162 (La. Ct. App. 1991). There, parents of children who were molested by a church youth director who had been counseled by the church pastor, sued the pastor for negligence, claiming that the pastor was negligent for failing to warn them that the youth director had molested his neighbors' children. The parents failed to allege in their complaint that the pastor had a special relationship with their children giving rise to a duty of protection of the children. They also failed to allege that they and their children were members of the church or that their children were molested in the course of church-sponsored activity. Before granting the pastor's motion to dismiss for failure to state a claim upon which relief could be granted, the trial court gave the parents an opportunity to amend their pleadings; they did so, but failed to allege facts that would support a special relationship giving rise to a duty of protection. The trial court granted the motion to dismiss and denied the parents' request for yet another opportunity to amend their pleadings. The appellate court affirmed, holding that the parents had failed to sufficiently plead a cause of action upon which relief could be granted and that the trial court was not required to give them yet another chance to amend their pleadings based on speculative facts.

In so ruling, the appellate court distinguished *L.P. v. Oubre*, 547 So. 2d 1320 (La. Ct. App. 1989), a case in which parents of minor children sexually molested by the scoutmaster of their Boy Scout troop sued the scoutmaster, the local troop sponsors, and the regional and national Boy Scouts of America organizations. The parents claimed that the governing organizations knew or had reason to know that the scoutmaster had molested minor troop members and negligently failed to warn the parents and to properly supervise the scoutmaster. The trial court struck various portions of the pleadings for failure to state a claim upon which relief could be granted against the regional and national organizations, and the parents appealed. The appellate court reversed, concluding that the parents had stated a cause of action against the governing organizations by alleging that under the auspices of the national governing body, the regional governing body undertook to promote, administer and supervise the local Boy Scout program, by alleging that the regional body knew or should have known that the scoutmaster had molested minor troop members, by alleging that the regional body failed to investigate the scoutmaster's background and failed to supervise him, by alleging that the regional body assumed and owed a duty of reasonable care to the troop members and their parents, and by alleging that the risk that a scoutmaster would sexually assault troop members is easily associated with the duty or obligation undertaken, with the foreseeable risk of injury to the scouts, and with the harm that occurred. The court reasoned that the plaintiffs had adequately pleaded the existence of a special relationship between themselves, the scoutmaster and the regional and national governing bodies of Boy Scouts of America that gave rise to a duty to control the conduct of the scoutmaster and to protect minor troop members by warning their parents of the scoutmaster's disposition to molest children. Accordingly, the trial court erred by granting the motion to dismiss based on inadequate pleading.

The Louisiana case of *Miller v. Everett* does not

stand for the proposition that a pastor or church does not have the kind of special relationship with children who are members of the congregation that gives rise to a duty to protect the children against a known risk that they might be sexually molested by the youth director of the church. Rather, the case stands for the proposition that plaintiffs must adequately plead a cause of action under the strict procedural requirements of Louisiana law. But to the extent that the case might reasonably be interpreted to stand for the proposition that a church and its paid or voluntary officials have no duty to protect minor children who regularly attend services, whether they are formally members of the congregation or not, from a known risk of sexual molestation by a church member who has been given a position of responsibility and authority over the children of the congregation, because of some perceived deficiency in the special relationship between the church and those children, we simply disagree with the Louisiana court. The vulnerability of children to sexual abuse by adults who are placed in positions of responsibility and authority over their well-being, whether of a spiritual or a temporal nature, does not vary depending upon whether the children are members of the church or simply attend on a regular basis. Nevertheless, in the instant case, Sheri and Janelle were members of the congregation in Twisp, in every sense of the word, given their father's position as pastor.

The Washington courts have recognized that many special relationships give rise to a duty to prevent harms caused by the intentional or criminal conduct of third parties.

> For example, a school has a duty to protect students in its custody from reasonably anticipated dangers. *McLeod v. Grant County Sch. Dist. No. 128*, 42 Wn.2d 316, 320, 255 P.2d 360 ((1953). *See also J.N. ex rel. Hager v. Bellingham Sch. Dist. No. 501*, 74 Wn. App. 49, 871 P.2d 1106 (1994); *Briscoe v. School Dist. No. 123*, 32 Wn.2d 353, 201 P.2d 697 (1949). The rationale for such a duty — the placement of the student in the care of the defendant with the resulting loss of the student's ability to protect himself or herself — is also the

basis for the similar duty of an innkeeper to protect guests from the criminal actions of third parties. *Hutchins*, 116 Wn.2d at 228 (citing JOSEPH A. PAGE, PREMISES LIABILITY § 11.2, at 292 (2d ed. 1988)).

> Other relationships falling into the general group of cases where the defendant has a special relationship with the victim are also protective in nature, historically involving an affirmative duty to render aid. The defendant may therefore be required to guard his or her charge against harm from others. Thus a duty may be owed from a carrier to its passenger, from an employer to an employee, from a hospital to a patient, and from a business establishment to a customer.

*Hutchins*, 116 Wn.2d at 228, 802 P.2d 1360 (citing W. PAGE KEETON ET AL., PROSSER AND KEETON ON TORTS § 56, at 383 (5th ed. 1984).

*Niece*, 131 Wn.2d at 44 (footnote omitted). The special tort duties arising from the special relationship between innkeepers and guests and between common carriers and passengers are based on the liable parties' assumption of responsibility for the safety of others. *Niece*, 131 Wn.2d at 46. A hospital's or nursing home's special relationship with its patients is based on the vulnerability of physically or mentally ill persons to provide care for themselves. *Niece*, 131 Wn.2d at 45. Similarly, we believe that churches and the adult church workers who assume responsibility for the spiritual well-being of children of the congregation, whether as paid clergy or as volunteers, have a special relationship with those children that gives rise to a duty to protect them from reasonably foreseeable risk of harm from those members of the congregation whom the church places in positions of responsibility and authority over them. In each of the protective special relationships considered by the Washington courts to date, one party has, in some sense, been entrusted with the well-being of another. "The entrustment aspect is what appears to us to underlie the imposition of the additional duty to protect someone from foreseeable criminal acts of third parties." *Lauritzen v. Lauritzen*, 74 Wn. App. 432, 440, 874 P.2d 861 (1994).

Ultimately, whether a "special relationship" giving rise to a legal duty exists involves the balancing of the societal interests involved, the severity of the risk, the burden upon the defendant, the likelihood of occurrence, the relationship between the parties, the temptation presented by the act or failure to act, the gravity of the harm that may result, and the possibility that some other person will assume the responsibility for preventing the conduct or the harm, together with the burden of the precautions which the actor would be required to take. *Lauritzen*, 74 Wn. App. at 442. By the time that Juanita was molested by Wilson, there can be little doubt that these factors balance in her favor, as the respondents seemingly recognize, given the differing natures of their motions for summary judgment as among the plaintiffs. The question we must decide, however, is whether the balancing sufficiently favors Sheri and Janelle. We believe that it does, so long as the risk of harm to them was reasonably foreseeable in light of the information available to Schulz before they were molested. Put another way, we must determine whether there is sufficient evidence that a rational trier of fact should be allowed to determine whether the risk of harm was reasonably foreseeable at the time Sheri and Janelle were molested, based on the telephone call to Schulz in 1968. The only distinction among the plaintiffs' respective causes of action is the amount of information that was available to church leaders before they were molested. Foreseeability is a question of fact for the jury unless the circumstances of the injury "are so highly extraordinary or improbable as to be wholly beyond the range of expectability." *McLeod v. Grant County Sch. Dist. No. 128*, 42 Wn.2d 316, 323, 255 P.2d 360 (1953). Schulz and the church contend that much more is understood today about child sexual abuse and the likelihood that child molesters will molest numerous victims, rather than only a single victim, than was understood in the late 1960s. They also contend that the information given by the woman caller was ambiguous, and that Schulz reasonably could have believed that Wilson was being accused merely of having made unwanted advances of

an immoral nature to a teen-aged girl rather than of molesting a child. These are reasonable arguments to make to a jury. They do not persuade us as a matter of law and policy that no duty arose based on the content of the telephone call. As we have already indicated, a rational trier of fact could determine, based on Schulz's sometimes conflicting versions of what the woman told him and based on his own recognition, as a result of the call, that it was his obligation as Youth Director to keep an eye on Wilson for the protection of the children of the congregation, and that he in fact understood that Wilson may have molested a child. Moreover, although Schulz did not know the woman caller, this was not an anonymous call; the woman identified herself by name. She was familiar with the nature of Wilson's church activities and wanted to speak with someone in authority at the church in Twisp. Schulz concluded that she was sincere in her concern for the well-being of the children of the church in Twisp.

Schulz and the church argue that there is little they could have done with the information Schulz had; it was not a written accusation giving rise to the possibility of formal disciplinary action. They could, they contend, have been sued for libel or slander if Schulz had issued any warnings to the congregation based on the content of the telephone call. They do not contend that Schulz could not reasonably have notified Pastor Barringer of the accusation when he arrived in Twisp a few months later with his three young daughters, and when he entrusted Wilson, whose leadership role in the church predated Barringer's arrival in Twisp, with the care of his daughters so that he could travel on church business. Moreover, we have ruled only that the special relationship between the church and the plaintiffs gave rise to a duty of protection of the plaintiffs. Whether that duty was breached in light of the information Schulz had in his possession is a question of fact for the jury.

That there is no evidence that Wilson molested Sheri and Janelle on church premises or in the course of church-

sponsored activities is not dispositive. The plaintiffs do not rely upon the duty of care owed by a landowner or business proprietor to a licensee but rather upon the duty of reasonable care owed by one in a special protective relationship with the victims based on entrustment for their spiritual well-being. A rational trier of fact could determine that the duty of reasonable care was breached when Schulz not only failed to notify Pastor Barringer of the warning Schulz had received but also failed to take any action that would have prevented Wilson from continuing to serve in leadership roles in the church that gave him responsibility for the spiritual well-being of the children of the congregation and that may have inspired trust by parents and children alike in Wilson's morality. There is also evidence in the record that Schulz knew that Pastor Barringer had called upon Wilson to babysit the plaintiffs so that the pastor could travel on church business; yet he failed to warn Pastor Barringer that Wilson might be a child molester.

In sum, we reverse the trial court's dismissal on summary judgment of Sheri's and Janelle's claims based on the principles set forth in RESTATEMENT (SECOND) OF TORTS § 315(b). In view of this ruling, we need not address the plaintiffs' contentions that Schulz and the church also had a duty to them arising under RESTATEMENT (SECOND) OF TORTS § 302B. *But see Golden Spread Council, Inc. No. 562 v. Akins*, 926 S.W.2d 287 (Tex. 1996) (reversing summary judgment in favor of regional governing body of Boy Scouts of America based on theories of liability found in RESTATEMENT (SECOND) OF TORTS § 302B, comment e. Boy scouts were molested by scoutmaster; regional governing body failed to thoroughly investigate allegations of sexual abuse by scoutmaster or to report information that scoutmaster had been "messing with some boys" to police.).

## II

We turn now to Juanita's claims, which were dismissed solely on the basis of the statute of limitations. The general

statute of limitations applicable to all of the claims in this case is the three-year limit set on negligence actions. RCW 4.16.080(2). All of the acts of molestation occurred more than three years before this lawsuit was filed. Accordingly, Juanita's claims are all time-barred unless preserved by either the statutory discovery rule applicable to claims based on child sexual abuse (RCW 4.16.340) or by the common-law discovery rule. The trial court ruled that RCW 4.16.340 did not apply to preserve Funkhouser's claims. Funkhouser contends that this ruling was erroneous.

RCW 4.16.340 provides, in pertinent part:

> All claims or causes of action based on intentional conduct brought by any person for recovery of damages for injury suffered as a result of childhood sexual abuse shall be commenced within the later of the following periods:
>
> (a) Within three years of the act alleged to have caused the injury or condition;
>
> (b) Within three years of the time the victim discovered or reasonably should have discovered that the injury or condition was caused by said act; or
>
> (c) Within three years of the time the victim discovered that the act caused the injury for which the claim is brought[.]

RCW 4.16.340(1).

 Under this court's recent interpretation of RCW 4.16.340, the statute applies only to intentional torts and does not apply to claims sounding in negligence. In *Jamerson*, the plaintiff, who had allegedly been sexually abused by her adoptive brother from 1968 to 1973, brought suit against her parents alleging that they had negligently failed to protect her from the abuse. *Jamerson v. Vandiver*, 85 Wn. App. 564, 566, 934 P.2d 1199 (1997). The trial court entered a directed verdict for the parents on the plaintiff's claims and plaintiff appealed. The *Jamerson* court affirmed, holding that RCW 4.16.340 tolls the statute of limitations for personal injury claims based on childhood sexual abuse *only* as to claims against the abuser. *Jamerson*, 85 Wn.

App. at 567. Since the claims for negligent supervision were not based on allegations that the plaintiff's parents had *themselves* sexually abused her, but instead on their alleged failure to protect her from the abuse, the *Jamerson* court ruled that RCW 4.16.340 did not apply and that the plaintiff's claims were properly dismissed as time-barred. *Id.* Under the clear precedent set by *Jamerson*, RCW 4.16.340 does not apply to negligence causes of action such as Juanita's.

Notwithstanding the holding in *Jamerson*, Juanita contends that the phrase "claims or causes of action based on intentional conduct" in RCW 4.16.340 demonstrates the Legislature's intent to extend the statute to claims against persons other than the abuser. She contends that "claims or causes of action based on intentional conduct" include her negligence claims because those claims "cannot arise but for, and subsequent to, the [intentional] actions of the [abuser]." Appellants' Opening Br. at 32-36. She cites no legislative history in support.

Although it is true that Juanita's negligence claims would be baseless if she had not been molested because she then would not have been harmed, her claims in negligence were not "based on" the intentional tort but rather on third parties' failure to prevent the tort. The elements of her cause of action in negligence are completely different from the elements of intentional tort claims against Wilson himself; it is, therefore, not correct to say that her claim was "based on" intentional conduct as the statute requires.

The Legislature enacted RCW 4.16.340 in order to overrule *Tyson v. Tyson*, 107 Wn.2d 72, 80, 727 P.2d 226 (1986), in which the Supreme Court held that the discovery rule did not apply in intentional tort cases where the plaintiff had suppressed the memory of abuse during the period of the statute of limitations. 1 LAWS OF 1991, ch. 212 ("RCW 4.16.340 [was enacted] to clarify the application of the discovery rule to childhood sexual abuse cases[, and] . . . to reverse . . . *Tyson v. Tyson*"). *Tyson* involved only a claim of intentional tort against the abuser himself, not

against any other person. Accordingly, the *Tyson* court never reached the application of the discovery rule to negligence claims such as those raised in this appeal.

Because the last act of abuse occurred in 1980 and Juanita did not file her suit until 1994, and because the statutory discovery rule of RCW 4.16.340 does not apply, Juanita's claims are time-barred under the three-year statute of limitations applicable to negligence claims unless the common-law discovery rule applies to preserve her claims.

The respondents, including CBC, contend that the common-law discovery rule should not be applied in cases of negligence for failure to prevent childhood sexual abuse in the absence of specific legislation authorizing such application. We disagree, and hold summarily that the judicially developed common-law discovery rule applies to all statutes of limitation, in the absence of legislation limiting the application of the rule.

Although the trial court properly held that the common-law discovery rule applied, it held that the rule was not satisfied in Funkhouser's case. The trial court stated:

> [A]s a matter of law plaintiff Funkhouser has failed to exercise due diligence. [Funkhouser] has at all times been aware that she was molested and has at all times known that she had been harmed by such molestation and through due diligence knew or should have known all of the elements of any and all causes of action more than three years before the filing of this litigation.

Clerk's Papers at 1044.

"The general rule in ordinary personal injury actions is that a cause of action accrues at the time the act or omission occurs." *In re Estates of Hibbard*, 118 Wn.2d 737, 744, 826 P.2d 690 (1992) (citation omitted). An exception to this is provided by the common-law discovery rule. Under the discovery rule, "a cause of action accrues when a claimant knows, or in the exercise of due diligence should have known, all the essential elements of the cause of action, specifically duty, breach, causation and damages." *Id.* at

752 (citations omitted). The question of whether a plaintiff was duly diligent in pursuing a legal claim is a question of fact for the jury unless reasonable minds could reach but one conclusion. *Allen v. State*, 118 Wn.2d 753, 760, 826 P.2d 200 (1992).

It is undisputed that Juanita has always recalled *some* of the acts of abuse against her and has always known that they harmed her to some extent. Respondents contend that because she always remembered some acts and corresponding injuries, the statute of limitations commenced running when she turned 18. The issue, however, is not when Funkhouser discovered Wilson's intentional tort, but when she discovered or should have discovered the elements of her negligence claims against the respondents. This, in turn, depended on her finding out that information about Wilson's history of sexually molesting children had been given to the respondents on two separate occasions before she was molested, and that they failed to warn her father or otherwise take reasonable steps to protect her from abuse by Wilson.

Whether Funkhouser should have discovered that the defendants did not disclose Wilson's history sooner than she did depends on whether she had "the means and resources to detect wrongs within the applicable limitation period," in other words, whether she "could have" known of that information. *Hibbard*, 118 Wn.2d at 749-50. Respondents argue that Funkhouser always had the means and resources to detect the wrongs in that all she had to do was to tell her father that Wilson had molested her. Her father, in turn, approached Schulz and asked him whether it was possible that his daughters had also been molested; it was then that Schulz revealed the telephone call in 1968. This led to further inquiry by Pastor Barringer, who then learned about the information that had been revealed to Pastor Akker and CBC in the mid-1970s, while Pastor Barringer was in Iowa, regarding Wilson's molestation of his granddaughter. It is true that Schulz disclosed the information known to him when asked; thus, this is not a case involving

concealment once the appropriate questions were asked. There also is no evidence that Pastor Akker failed to disclose the information he had been given, once he was asked. But the respondents' arguments ignore certain basic realities that our Legislature recognized when it enacted the statutory discovery rule relating to childhood sexual abuse. Although we agree with the trial court that that statute provides no direct relief to Juanita with respect to her claims against the respondents, we believe that the courts should take into account the legislative findings that led to the adoption of that statute, in considering the application of the common-law discovery rule in cases based on negligent failure to prevent child sex abuse:

The legislature finds that:

(1) Childhood sexual abuse is a pervasive problem that affects the safety and well-being of many of our citizens.

(2) Childhood sexual abuse is a traumatic experience for the victim causing long-lasting damage.

(3) The victim of childhood sexual abuse may repress the memory of the abuse or be unable to connect the abuse to any injury until after the statute of limitations has run.

(4) The victim of childhood sexual abuse may be unable to understand or make the connection between childhood sexual abuse and the emotional harm or damage until many years after the abuse occurs.

(5) Even though victims may be aware of injuries related to the childhood sexual abuse, more serious injuries may be discovered many years later.

(6) The legislature enacted RCW 4.16.340 to clarify the application of the discovery rule to childhood sexual abuse cases. At that time the legislature intended to reverse the Washington supreme court decision in *Tyson v. Tyson* [citation omitted].

It is still the legislature's intention that *Tyson v. Tyson* [citation omitted] be reversed, as well as the line of cases that state that discovery of any injury whatsoever caused by an act of childhood sexual abuse commences the statute of limitations. The legislature intends that the earlier discovery of less

serious injuries should not affect the statute of limitations for injuries that are discovered later.

1 LAWS OF 1991, ch. 212. It would be an anomaly to require a victim of childhood sexual abuse to discover any claim she may have for negligent failure to prevent childhood sexual abuse before she is required to discover her claim against the abuser himself.

Although Juanita can find no direct relief under RCW 4.16.340, the same factors that are likely to delay recognition of the full extent of injury inflicted by the perpetrator of sexual abuse are likely to delay discovery that the abuse might have been prevented if persons having a special relationship with the child had not breached a duty to protect the child from the abuse. Here, there is evidence that although Juanita always knew that Wilson had molested her, she suppressed the memory of the worst of the abuse until she was in therapy. Only after receiving therapy was she able to disclose the abuse to her father. Her disclosure to her father led to the discovery of her cause of action against the respondents only by happenstance. Pastor Barringer disclosed the abuse to Schulz because he was concerned for the welfare of Schulz's daughters; he did not set out to discover a cause of action by his daughters against the respondents or any of them by making that initial disclosure. Indeed, we believe that a rational trier of fact could conclude that the failure of church leaders to take reasonable steps to protect children of the congregation from sexual abuse by another church leader whom they believe to have molested even one child, let alone more than one, is so far beyond the pale of expected human behavior that due diligence simply does not require that an inquiry be made as to whether church leadership concealed their knowledge instead of taking reasonable steps to protect the children of the congregation.

Moreover, the respondents' position, if adopted by this court, would be tantamount to ruling as a matter of law that victims of child sexual abuse must disclose the fact of the abuse to everyone who might possibly be able to help

them discover whether anyone else may have negligently failed to prevent the abuse. Here, the argument is made that Juanita should have told her father; but that argument is made only because, by happenstance, Pastor Barringer's concerns did, in fact, lead to the discovery of Juanita's cause of action against the respondents. We decline to rule as a matter of law that Juanita failed to exercise due diligence by failing to disclose the abuse to her father until 1991. The respondents may wish to make that argument to a jury, if they can find no more logical basis for arguing a lack of due diligence, but we are not persuaded as a matter of law that Juanita failed to exercise due diligence.

In conclusion, we reverse both summary judgments and remand the claims of all three plaintiffs for trial or such other disposition as shall be consistent with this opinion.

AGID and BECKER, JJ., concur.

Review granted at 135 Wn.2d 1001 (1998).