JAMES L. ROBART, United States District Judge
I. INTRODUCTION
This matter comes before the court on Defendants Everett School District and Carol Whitehead's (collectively, "the District") first and second motions for summary judgment (1st MSJ (Dkt. # 57); 2d *1247 MSJ (Dkt. # 59) ), and Defendant Craig Verver's motion for summary judgment (Verver MSJ (Dkt. # 61) ). A.T. opposes the motions (see 1st Resp. (Dkt. # 63); 2d Resp. (Dkt. # 69); Verver Resp. (Dkt. # 68) ), and all Defendants have filed replies (see 1st Reply (Dkt. # 66); 2d Reply (Dkt. # 74); Verver Reply (Dkt. # 77) ). Having considered these submissions, the relevant portions of the record, and the applicable law, the court, considering itself fully advised, GRANTS the District's first motion for summary judgment (1st MSJ) and GRANTS Mr. Verver's motion for summary judgment (Verver MSJ). The court also DENIES the District's second motion for summary judgment (2d MSJ) as moot. Accordingly, the court dismisses this case with prejudice.
II. BACKGROUND
A.T.[1] attended Cascade High School in the Everett School District from 1999 to 2003. (1st Resp. at 6.) Mr. Verver was one of A.T.'s teachers during the 2001-2002 and 2002-2003 school years. (Id. at 6; see also SAC (Dkt. # 28) ¶ 7.) A.T. was also a cabinet member of the National Honor Society, for which Mr. Verver served as a faculty adviser. (1st Resp. at 6.) During the 2001-2002 school year, Mr. Verver singled out A.T. in class, teased her,[2] and gave her special attention. (Id. ; see also Cochran Decl. (Dkt. # 65) ¶ 15, Ex. N ("A.T. Interrogatories") at 202.) Mr. Verver told A.T. that she would need to take "calculated risks" to be exceptional enough to stand out for college admissions. (SAC ¶ 9.) At the end of the school year, Mr. Verver encouraged A.T. to run for Honor Society president, a position that required working closely with him in his capacity as faculty adviser. (Id. ¶ 10.) A.T. was elected Honor Society president for the following year, and Mr. Verver gave A.T. his personal contact information so that they could be in touch over the summer. (Id. ; 1st Resp. at 6.)
In October 2002, while A.T. was 17-years-old, A.T. attended a school dance. (A.T. Interrogatories at 198.) After the dance, A.T. stayed to help clean up. (Id. ) While there, Mr. Verver kept A.T. for hours and engaged her in conversation about their "unique relationship." (Id. ) Mr. Verver also told A.T. that "he worried about his role in her life and was envious of her parents because A.T. might leave him after graduation while she would always be her parents' child." (SAC ¶ 11.) Mr. Verver expressed to A.T. that he was concerned about her future and protective of who she may choose to date or marry. (Id. ) Mr. Verver also shared with A.T. that he was having marital problems. (A.T. Interrogatories at 198.) At the end of their conversation, Mr. Verver gave A.T. "a very long and close hug." (Id. ) After this date, Mr. Verver frequently hugged A.T. closely when she left his classroom if she had been there on the weekends or after school. (Id. at 200.)
Around two weeks after the school dance, Mr. Verver confided in A.T. that his wife was pregnant and that he was "crushed about the news." (Id. at 198-99.) A.T. also began confiding in Mr. Verver about her relationships with boys. (Id. at 199.) During one conversation, A.T. told Mr. Verver that she was uncomfortable being physical with her boyfriends. (Id. ) In response, Mr. Verver sat next to A.T. on the couch in his classroom and asked, *1248 "[D]o you feel uncomfortable about me sitting here?" (Id. ) He then put his hand on A.T.'s thigh and asked A.T. whether she would be able to say "no" if a date put his hand on her thigh. (Id. )
A.T. turned 18 on January 5, 2003. (SAC ¶ 14.) Later that month, she visited Mr. Verver's classroom. (Id. ) Mr. Verver greeted A.T. with a hug and a kiss on the cheek. (Id. ; see also A.T. Interrogatories at 203.) The next time A.T. saw Mr. Verver, he asked her how she felt about the kiss. (A.T. Interrogatories at 203.) A.T. told Mr. Verver that it made her nervous. (Id. ) Mr. Verver kissed her again on the cheek. (Id. )
At the end of January 2003, A.T. was in Mr. Verver's classroom on a weekend. (Id. at 204.) Mr. Verver told A.T. that he was going to "steal a kiss" and kissed A.T. on the mouth. (Id. ) A.T. became "physically upset" and "started trembling and twitching uncontrollably." (Id. ) Mr. Verver told A.T. that he was going to "steal another kiss" and kissed her again. (Id. ) Mr. Verver suggested that they move to the couch, and Mr. Verver kissed A.T. and tried to put his hands up her shirt, though A.T. resisted. (Id. ) A.T. felt "humiliated" and "scared" about making Mr. Verver angry "if she said that wasn't what she wanted" and "blamed herself for making him have that misunderstanding." (Id. at 204-05.) When A.T. returned home that day, she "hid in her closet" and cried uncontrollably. (Id. at 205.) The next school day, Mr. Verver pulled A.T. aside before school started to discuss what had happened between them. (Id. ) Mr. Verver told A.T. it could never happen again, but then pulled her in and kissed her, saying, "[W]ell, we both knew we couldn't help ourselves." (Id. )
The sexual relationship between A.T. and Mr. Verver continued to escalate. (Id. at 205-06.) After school, on the weekends, and even sometimes during school hours, Mr. Verver would invite A.T. into his classroom, lock the door, and engage in intimate contact with A.T. (Id. ) The sexual contact occurred two to three times a week for the rest of A.T.'s senior year, ranging from kissing to sexual intercourse. (Id. at 205-11.) The first time A.T. and Mr. Verver had sexual intercourse was on April 26, 2003. (Id. at 208.) A.T. went to Mr. Verver's classroom to gather supplies for a car wash. (Id. ) Mr. Verver produced a condom and asked A.T. to put one on him. (Id. ) A.T. hesitated, and Mr. Verver told her, "If you want me to wear this then you have to put it on me." (Id. ) A.T. acquiesced, and the two had sexual intercourse. (Id. ) After this encounter, Mr. Verver and A.T. had sex on multiple occasions in his classroom and in other locations at the school. (Id. at 210.)
Throughout the 2002-2003 school year, teachers who frequently stopped by Mr. Verver's classroom after school and on the weekends would find A.T in his classroom. (SAC ¶ 19.) On some occasions, Mr. Verver's door was locked. (Id. ) Upon Mr. Verver opening the door, teachers would find A.T. on his couch. (Id. ) In addition, teachers also saw Mr. Verver give A.T. rides home from school. (Id. )
A.T. graduated from high school in summer 2003, and began attending the University of Washington that fall. (1st Resp. at 8-9; A.T. Interrogatories at 213-14.) A.T. eventually graduated from the University of Washington in 2008, with bachelor's degrees in English and French. (Id. ) While A.T. studied at the University of Washington, she and Mr. Verver continued their sexual relationship. (1st Resp. at 9.) On January 8, 2006, A.T. journaled about discussing the relationship with Mr. Verver: "[A]nd then we moved onto the topic of possible damage done and why we yet don't stop." (Leitch Decl. ¶ 4, Ex. B at 2.)
In fall 2008, A.T. began graduate school at UCLA to pursue a PhD in French *1249 Studies. (1st Resp. at 9.) Near the end of 2009, A.T. was teaching an undergraduate French class when she had a "significant reaction" to being the teacher in a classroom of students. (Id. ) A.T. subsequently fainted on campus, and her PhD supervisor advised her to see a therapist. (Id. ) A.T. took her supervisor's advice and sought counseling at UCLA. (Id. )
At the beginning of her therapy sessions, A.T. told the therapist that she had an "on and off" relationship with an older married man. (Id. at 9-10.) On April 18, 2010, A.T. told the therapist that she felt guilty and frustrated with aspects of her relationship with Mr. Verver. (Id. at 10.) A.T. received her first psychological diagnosis at this session: Adjustment Disorder with Mixed Anxiety and Depressed Mood. (Id. )
Around September 2011, A.T. moved abroad to Cambridge to continue her studies. (Id. ) In June 2012, A.T. returned to UCLA to defend her dissertation prospectus. (Id. ) On this trip, she traveled to Seattle to confront Mr. Verver and tell him that she no longer wanted a sexual relationship with him. (Id. at 10-11.) Mr. Verver agreed to stop the sexual relationship, but on the way home from dinner, Mr. Verver pulled over in an abandoned parking lot, undid his pants, and demanded oral sex. (A.T. Interrogatories at 219.) A.T. "numbly complied." (Id. ) After Mr. Verver ejaculated, he "laughed, let out a satisfied sigh, and said ... 'now I guess it's okay if you go.' " (Id. )
After A.T. returned to Cambridge, she journaled extensively about the relationship. In a January 29, 2012, entry-when A.T. was 27-years-old-A.T. wrote that she "feel[s] damaged by [the] relationship." (Leitch Decl. ¶ 5, Ex. C at 3.) On September 12, 2012, A.T. wrote an email to her PhD supervisor at UCLA regarding the relationship and the grief it caused her. (Id. ¶ 7, Ex. E at 3.) A.T. explained in this email that, since she taught her French class in 2009, she "realized the power dynamics that had been operative ... [and] had a really difficult time teaching that whole year." (Id. ) On September 27, 2012, A.T. called Mr. Verver. (Id. ¶ 9, Ex. G at 2-3.) A.T. detailed the phone call in her journal: "I think this is when I let loose a flood of my feelings and hurt and shame about everything ... about wanting to kill myself, about feeling like I had zero integrity ... and that I felt groomed and manipulated, regardless of whether he meant to." (Id. at 3.)
The next day, on September 28, 2012, A.T. went to Cambridge University Counseling Service. (Id. ; see also Cochran Decl. ¶ 11, Ex. J ("Cambridge Counseling") at 146.) A.T. wrote her reason for seeking counseling services was because she was "getting out of a harmful relationship and [she] need[s] some help right now while [she's] feeling very fragile." (Cambridge Counseling at 146.) A.T. further explained:
The relationship was with a teacher, and it began while I was still in his class ... I have only just recently (like, for two months) allowed myself to think about this relationship as harmful, and admitting that has been incredibly painful.... This whole thing shuts me down fairly often (where I don't get out of bed or eat really for several days at a time); I used to think of harming myself, but not for the last two years.
(Id. ) Around this time, the people A.T. confided in about the relationship described Mr. Verver's actions as "abuse" and "coercion" and "grooming." (Leitch Decl., Ex. D at 11.)
While A.T. was at Cambridge, she had been exploring her sexual and gender identity. (1st Resp. at 10-11.) A.T. eventually began to identify as genderqueer and married another genderqueer individual, *1250 Jack, in October 2013. (Cochran Decl. ¶ 2, Ex. A ("A.T. Depo. Vol. 1") at 4.)
A.T. returned to the United States in 2013. (1st Resp. at 11.) On April 24, 2013, A.T. again sought therapy at UCLA. (Leitch Decl. ¶ 11, Ex. I at 3.) On the intake form, A.T. reported "ongoing issues around an abusive relationship," and that she was concerned about "Anxiety, fears, or nervousness ... Depression ... [and] Sexual abuse or assault." (Id. ) A.T. also wrote that she was previously in counseling "six months ago for the sexual abuse issues." (Id. ) A.T. then met with the counselor, who noted A.T.'s diagnosis of Adjustment Disorder with Mixed Anxiety and Depressed Mood. (Id. at 5.)
A.T. returned to UCLA counseling in May 2013, telling the therapist that she was in "recovery from a past power abusive relationship with [a] former teacher." (Leitch Decl. ¶ 12, Ex. J at 3.) A.T. also reported that she became aware of the power abusive nature of the relationship when she started a teaching role in graduate school (presumably referring to the 2009 French class). (Id. ) The counselor noted that A.T. had symptoms of anxiety, depression, and difficulty concentrating, and reiterated A.T.'s diagnosis of Adjustment Disorder with Mixed Anxiety and Depressed Mood. (Id. at 3-4.)
A.T. completed the fall 2013 quarter at UCLA, but then quit her PhD program because she "had a lot going on" and "never obtained secure housing." (1st Resp. at 11-12.) A.T. and Jack then moved to San Francisco where A.T. worked as a housekeeper. (Id. at 12-13.) In February 2015, A.T. had a double mastectomy to obtain a "more masculine torso profile." (Cochran Decl. ¶ 3, Ex. B at 62.)
In fall 2015, A.T. went to two job fairs to consider becoming a substitute teacher and going back to school to earn a teaching certificate. (1st Resp. at 12.) At both events, A.T. was "unusually hypervigilant." (Id. ) Looking around the room at these events, A.T. was overwhelmed with the thought that all of these people could be abusing or hurting students, and that A.T. becoming a teacher would make her complicit in the abuse. (Id. ) At the second event, A.T. had a panic attack. (Id. ) A.T. alleges that fall 2015:
[I]s when she realized that she had suffered an actual psychological injury due to Craig Verver's actions: When she realized that the physical and psychological consequences of his abuse prevented her from successfully pursuing the career that she had trained for, and prevented her from being able to complete her graduate degree.
(Id. ) A.T. claims that she "first saw an attorney relating to anything Verver" in November 2015, after the job fairs. (Id. at 13.) After A.T. described her history with Mr. Verver to the attorney, the attorney confirmed that A.T. could file a lawsuit. (Id. )
In November or December 2016, A.T. saw her primary care physician. (A.T. Depo. Vol. 1 at 7.) At this appointment, her doctor diagnosed A.T. with Posttraumatic Stress Disorder ("PTSD"). (Id. ) This was the first time A.T. was diagnosed with PTSD. (Id. ) According to A.T., however, "ever since things began with Craig Verver," she has "experienced nightmares and different manifestations of PTSD, anxiety kind of things, [and] hypervigilance." (Id. ) A.T. is not sure when she "would call that PTSD because ... [her] understanding of that[ disease] evolved," but "it was most disorienting after [she] ended contact with [Mr. Verver] in 2012." (Id. )
A.T.'s expert consultant for this case, Dr. Gilbert Kliman, reviewed A.T.'s medical records and relevant testimony, and described A.T.'s situation in the following manner:
*1251 The situation of the plaintiff is like that of a person who at one point has a minor seeming skin rash and does not know that it is going to proceed to be a major disorder, Lyme Disease, which will affect many systems of her body....
In this case, the plaintiff years ago received diagnoses of adjustment reaction disorder, a minor disorder which is defined as a reaction to a stressor. The stressor was identified as a relationship with a married former teacher of the stressed person. The plaintiff was aware of the stressor, but she was not aware of the future consequences of which we now know. Nor could she have been aware....
[PTSD] is a major mental disorder which went undiagnosed by a mental health professional until 2016.
(Kliman Decl. (Dkt. # 64) ¶¶ 7-9.) Dr. Kliman admitted that A.T. "underwent fairly significant therapy in 2012." (Cochran Decl. ¶ 5, Ex. D ("Kliman Depo.") at 84.) But, according to Dr. Kliman, PTSD is different from A.T.'s earlier diagnoses of anxiety, depression, and adjustment reaction disorder. (Id. at 86 (explaining that "PTSD is not considered an anxiety disorder," that PTSD is "clearly differentiated" from depression, and that PTSD is not the same as "adjustment reaction disorder ... by a long shot").)
On August 23, 2016, A.T. "presented" a tort claim to the District. (1st MSJ at 7; 1st Resp. at 14; Leitch Decl. ¶ 16, Ex. N); see also RCW 4.96.020(2) ("A claim is deemed presented when the claim form is delivered in person or is received" by the entity's designated agent"). On September 30, 2016, A.T. filed her first complaint in the present case, asserting 42 U.S.C. § 1983 claims against Mr. Verver and the District, and Title IX claims against the Everett School District only. (See generally Compl. (Dkt. # 1).) A.T. alleges that Mr. Verver sexually "groomed" and assaulted her in violation of the Ninth and Fourteenth Amendments of the United States Constitution. (SAC ¶ 25.) A.T. further alleges that the District acted deliberately indifferent to her wellbeing, safety, and educational environment in violation of the Ninth and Fourteenth Amendments as well as Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a). (Id. ¶¶ 26-27.) A.T. seeks compensatory and punitive damages for the violation of her constitutional rights as well as "mental anguish and emotional distress." (Id. ¶¶ 23-24.) On October 17, 2016, A.T. amended her complaint to add state law claims of negligence and negligent infliction of emotional distress against the Everett School District based on its negligent training, retention, and supervision of Mr. Verver. (FAC (Dkt. # 7) ¶¶ 26-27; see also SAC ¶¶ 28-29.)
On October 27, 2016, Mr. Verver filed a motion to dismiss on the basis that A.T.'s claims were time-barred by the applicable statutes of limitations. (See generally MTD (Dkt. # 12).) The court granted the motion, finding that A.T. had not clearly alleged when she discovered her injury. (See generally MTD Order.) The court simultaneously granted A.T. leave to amend her complaint to remedy the deficiencies. (Id. at 8.) On March 3, 2017, A.T. amended her complaint to say that she "did not know or even begin to understand the extent of her injuries and damages until 2015." (SAC ¶ 21.) Defendants contend that A.T.'s second amended complaint alleges injuries that began accruing no later than May 2013, making A.T.'s claims untimely. (See generally 1st MSJ; Verver MSJ.)
III. ANALYSIS
A. Summary Judgment Standard
Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the nonmoving party, demonstrates *1252 "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) ; see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ; Galen v. Cty. of L.A., 477 F.3d 652, 658 (9th Cir. 2007). The moving party bears the initial burden of showing there is no genuine issue of material fact and that he or she is entitled to prevail as a matter of law. Celotex, 477 U.S. at 323, 106 S.Ct. 2548. If the moving party meets his or her burden, then the nonmoving party "must make a showing sufficient to establish a genuine dispute of material fact regarding the existence of the essential elements of his case that he must prove at trial" in order to withstand summary judgment. Galen, 477 F.3d at 658.
In determining whether the fact-finder could reasonably find in the nonmoving party's favor, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Nevertheless, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott v. Harris , 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (internal quotation marks omitted) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ). The court may only consider admissible evidence when ruling on a motion for summary judgment. Orr v. Bank of Am., NT & SA, 285 F.3d 764, 773-75 (9th Cir. 2002).
B. Statute of Limitations
The statute of limitations period for a 42 U.S.C. § 1983 claim is "that of the forum state's statute of limitations for personal injury torts." Elliott v. City of Union City , 25 F.3d 800, 802 (9th Cir. 1994). Title IX claims also borrow the forum state's personal injury tort limitations period. Stanley v. Trs. of Cal State Univ., 433 F.3d 1129, 1134 (9th Cir. 2006). In Washington, personal injury torts have a three-year statute of limitations period. Joshua v. Newell , 871 F.2d 884, 886 (9th Cir. 1989) ; RCW 4.16.080(2). Therefore, in a Washington forum, the statute of limitations for a section 1983 claim and a Title IX claim, as well as the torts of negligence and negligent infliction of emotional distress, is three years. See RK Ventures, Inc. v. City of Seattle, 307 F.3d 1045, 1058 (9th Cir. 2002). Although the parties dispute whether A.T.'s state law claims implicate RCW 4.16.340 -Washington's statutory discovery rule for actions based on childhood sexual abuse-the statute of limitations under this provision is also three years. RCW 4.16.340(1). Therefore, the applicable limitations period for all of A.T.'s claims is three years.
C. Effective Filing Date of A.T.'s Complaint
Before analyzing when the statute of limitations for A.T.'s claims began to accrue, the court will first determine the effective filing date of A.T.'s complaint. Only the District briefly mentioned this issue, stating that it "considers August 23, 2016[,] as the effective filing date" for all of A.T.'s claims. (See 1st MSJ at 13 n.2.) The District's analysis is incorrect.
When a party wishes to commence a tort action for damages against a local government entity, the party must first "present" the tort claim to that entity. RCW 4.96.020(2) - (4). A party cannot commence *1253 the action until 60 days after presenting the claim. RCW 4.96.020(4). "A claim is deemed presented when the claim form is delivered in person or is received" by the entity's designated agent. RCW 4.96.020(2). The applicable statute of limitations period is "tolled during the sixty calendar day period." RCW 4.96.020(4) ; see Boston v. Kitsap Cty. , 852 F.3d 1182, 1189 (9th Cir. 2017) (if a plaintiff timely submits a claim under RCW 4.96.020, "his statute of limitations is automatically three years and 60 days"). Because RCW 4.96.020 is a "special statute of limitations," and not a "tolling statute," RCW 4.96.020 only applies to state claims. See Boston, 852 F.3d at 1188-89 ; cf. Harding v. Galceran , 889 F.2d 906, 909 (9th Cir. 1989) ("federal law requires this court to apply state tolling rules"). Courts should liberally construe RCW 4.96.020's procedural requirements "so that substantial compliance will be deemed satisfactory." RCW 4.96.020(5). In Washington, substantial compliance with a statutory requirement means that the "statute has been followed sufficiently so as to carry out the intent for which the statute was adopted." Banner Realty, Inc. v. Dep't of Revenue, 48 Wash.App. 274, 738 P.2d 279, 281 (1987) (internal citation omitted). "The purpose of claim filing statutes is to 'allow government entities time to investigate, evaluate, and settle claims.' " Lee v. Metro Parks Tacoma, 183 Wash.App. 961, 335 P.3d 1014, 1017 (2014) (quoting Medina v. Pub. Util. Dist. No. 1 of Benton Cty. , 147 Wash.2d 303, 53 P.3d 993, 997 (2002) ).
A.T. sent a state tort claim notice to the District on August 16, 2016, but the claim was not "presented" to the District until August 23, 2016. (See Leitch Decl., Ex. N (A.T. 's tort claim notice letter is dated August 16, 2016, but the District's "received" stamp is dated August 23, 2016) ); see also RCW 4.96.020(2). A.T. filed her first complaint with the court on September 30, 2016, alleging only the federal section 1983 and Title IX claims. (See Compl.) On October 17, 2016, 55 days after the claim was presented to the District, A.T. amended her complaint to add the state law negligence claims-perhaps believing that August 16, 2016, was the operative date that triggered the 60-day period. (See FAC.) Nonetheless, pursuant to RCW 4.96.020(5), the court will liberally construe A.T.'s actions as substantially complying with RCW 4.96.020 such that the effective filing date for her state tort claims is October 22, 2016[3] -60 days after her claims were "presented" to the District. Therefore, A.T.'s state claims must have begun to accrue within three years and 60 days before October 22, 2016, to be timely. See RCW 4.96.020(4). Conversely, because RCW 4.96.020 does not apply to federal claims, the effective filing date for A.T.'s section 1983 and Title IX claims is the date of her first complaint: September 30, 2016. (See generally Compl.); see also Boston , 852 F.3d at 1188-89. Therefore, A.T.'s federal claims must have begun to accrue within three years of September 30, 2016, to be timely.
D. Discovery Rules
The parties agree that A.T.'s claims of abuse occurred more than three years before this lawsuit was filed. (See generally 1st MSJ; Verver MSJ; 1st Resp.) Accordingly, A.T.'s claims are untimely unless they are saved by either a common law discovery rule or a statutory discovery rule such as RCW 4.16.340. The court will first determine the applicable state law discovery *1254 rule and apply it to A.T.'s state claims. The court will then determine the applicable federal law discovery rule and apply it to A.T's federal claims. For the following reasons, under both the state and federal analyses, A.T.'s claims are untimely.
1. A.T.'s State Law Negligence Claims are Untimely
Under the Washington common law discovery rule, the limitations period for negligence claims begin to accrue when "a claimant knows, or in the exercise of due diligence should have known, all the essential elements of the cause of action, specifically duty, breach, causation and damages." Funkhouser v. Wilson , 89 Wash.App. 644, 950 P.2d 501, 512 (1998) (quoting In re Estates of Hibbard, 118 Wash.2d 737, 826 P.2d 690, 698 (1992) ). State law claims that implicate RCW 4.16.340's discovery rule, however, begin to accrue at the later of the following periods: (a) when the act occurred that caused the injury occurred; (b) when "the victim discovered or reasonably should have discovered that the injury or condition was caused by said act"; or (c) when "the victim discovered that the act caused the injury for which the claim is brought." RCW 4.16.340(1)(a)-(c). RCW 4.16.340 was enacted to provide a "broad and generous application of the discovery rule to civil actions for injuries caused by childhood sexual abuse." C.J.C. v. Corp. of Catholic Bishop of Yakima, 138 Wash.2d 699, 985 P.2d 262, 269 (1999).
By its terms, RCW 4.16.340 applies to "[a]ll claims or causes of action based on intentional conduct brought by any person for recovery of damages for injury suffered as a result of childhood sexual abuse." RCW 4.16.340(1). "Childhood sexual abuse" is defined as "any act committed by the defendant against a complainant who was less than eighteen years of age at the time of the act and which act would have been a violation of chapter 9A.44 RCW or RCW 9.68A.040." RCW 4.16.340(5). Under RCW 9A.44.096, sexual misconduct with a minor in the second degree includes when "the person is a school employee who has ... sexual contact with an enrolled student of the school who is at least sixteen years old and not more than twenty-one years old and not married to the employee, if the employee is at least sixty months older than the student." RCW 9A.44.096(1)(b). Lastly, "sexual contact" includes "any touching of the sexual or other intimate parts of a person done for the purpose of gratifying sexual desire of either party or a third party." RCW 9A.44.010(2). Therefore, as relevant here, if Mr. Verver "sexually contacted" A.T. before she turned 18, then RCW 4.16.340's statutory discovery rule will apply.
The Defendants argue that A.T. was 18-years-old when the first "sexual contact" between A.T. and Mr. Verver occurred, making RCW 4.16.340 inapplicable. (See 1st MSJ at 9-10; Verver Mot. at 11-12.) Conversely, A.T. argues that Mr. Verver's "hugs and the touching of her thigh" while she was 17 qualify as sexual contact, thus implicating RCW 4.16.340. (See 1st Resp. at 16-17 n.91.)
For purposes of the "sexual contact" definition, "[t]he determination of which anatomical areas apart from the genitalia and breasts are intimate is a question to be resolved by the trier of the facts." In re Welfare of Adams, 24 Wash.App. 517, 601 P.2d 995, 997 (1979) (internal citation omitted). In determining what is an "intimate part" under RCW 9A.44.010(2), the trier of fact should ask whether "a person of common intelligence has fair notice that the nonconsensual touching of [the body part] is prohibited, particularly if that touching is incidental to other activities which are intended to promote sexual gratification of the actor." Id.
*1255 The trier of fact should also consult "commonly accepted community sense of decency, propriety and morality." Id. Under this test, hips have been considered an intimate body part such that touching them is "sexual contact." Id. The factfinder should also consider whether the adult initiated the touching for "sexual gratification." See State v. Powell , 62 Wash.App. 914, 816 P.2d 86, 88 (1991).
Here, a reasonable jury could find that Mr. Verver's "very long and close" hugs and touching of A.T.'s thigh while A.T. was 17-years-old constituted "sexual contact." (See A.T. Interrogatories at 199-200.) Additionally, a reasonable factfinder could find that Mr. Verver conducted this touching for his sexual gratification. See RCW 4.16.340(5) ; see also RCW 9A.44.096(1)(b) ; RCW 9A.44.010(2). The court will therefore use RCW 4.16.340's statutory discovery rule to analyze the limitations period for A.T.'s state law claims.
RCW 4.16.340 provides three different accrual points for a limitations period. RCW 4.16.340(1)(a)-(c). A.T. appears to rely only on RCW 4.16.340(1)(c),[4] claiming that she did not make the causal connection between Mr. Verver's acts and her injuries until the fall 2015 job fairs. Under section 1(c), the statute of limitations begins to run when the victim "discovers the causal connection between the defendant's acts and the injuries for which the claim is brought." Hollmann, 949 P.2d at 387 ; Korst v. McMahon, 136 Wash.App. 202, 148 P.3d 1081, 1084 (2006) ( RCW 4.16.340(1)(c)"specifically focuses on when a victim of sexual abuse discovers the causal link between the abuse and the injury for which the suit is brought").
In crafting RCW 4.16.340, the Washington legislature noted, among other things, that "[e]ven though victims may be aware of injuries related to the childhood sexual abuse, more serious injuries maybe discovered later." Funkhouser, 950 P.2d at 513 (quoting 1991 Wash. Sess. Laws 1084). RCW 4.16.340(1)(c) accounts for the fact that victims of childhood sexual abuse may know that they have been affected in some way by the abuse, but they may not appreciate the more serious injury until a later date. Korst, 148 P.3d at 1085. Only when the more serious injury arises, and the victim makes the causal connection between the abuse and injury, will the statute of limitations begin to run. Id. Courts therefore apply section (1)(c) in two circumstances: "(1) where there has been evidence that the harm being sued upon is qualitatively different from other harms connected to the abuse which the plaintiff had experienced previously, or (2) where the plaintiff had not previously connected the recent harm to the abuse." Carollo v. Dahl , 157 Wash.App. 796, 240 P.3d 1172, 1174 (2010). But courts are clear that RCW 4.16.340(1)(c) does not say that the limitations period resets every time a victim's injuries worsen. See id. at 1175 (declining to restart the statute of limitations when the victim's already-present problems worsened). Instead, if a victim has already connected her injury to the abuse, the statute of limitations will reset only for a new, "qualitatively different" injury. Id. at 1174.
A.T. argues that her 2016 PTSD diagnosis is "vastly different" than her previous injury. (See 1st Resp. at 24-25.) The court recognizes that PTSD is a different diagnosis *1256 than A.T.'s earlier diagnoses of Adjustment Disorder with Mixed Anxiety and Depressed Mood. (See Kliman Depo. at 86). But RCW 4.16.340(1)(c) speaks of "injury," not of "diagnosis." Carollo , 240 P.3d at 1175. Put another way, for purposes of RCW 4.16.340(1)(c), the injury is the "problems associated with" the diagnosis, not the diagnosis itself. Id.
As A.T. herself explained:
I've experienced nightmares and different manifestations of PTSD, anxiety kind of things, hypervigilance, ever since things began with Craig Verver in an inappropriate and secretive way.... I don't know when I would call that PTSD because ... my understanding of that's evolved.... I think it was most disorienting after I ended contact with him in 2012.
(A.T. Depo. Vol. 1 at 7.) Thus, in the light most favorable to A.T., there is no genuine dispute of material fact that A.T.'s problems associated with PTSD are, at most, a quantitative difference from her previous problems, for which she first received a diagnosis in April 2010. (Leitch Decl., Ex. B at 10.)
The present case is analogous to Carollo v. Dahl, 157 Wash.App. 796, 240 P.3d 1172 (2010). Mr. Carollo was a childhood abuse victim who sought counseling in 1988 for emotional difficulties. Id. at 1173. The counselor told Mr. Carollo that his difficulties were likely due to the molestation. Id. Mr. Carollo sought counseling again in 1995, when he was diagnosed with PTSD symptoms, including depression and nightmares related to the molestation. Id. In 2008, Mr. Carollo's PTSD symptoms significantly worsened, causing him to lose his employment. Id. Mr. Carollo saw another therapist who explained that PTSD symptoms can "wax and wane over time." Id. The therapist further diagnosed Mr. Carollo with panic disorder, major anxiety, and major depressive disorder in 2008. Id. Later in 2008, Mr. Carollo filed a lawsuit against his abuser. Similar to A.T., Mr. Carollo claimed that "the severity of his most recent symptoms" should restart the statute of limitations. Id. at 1175. In holding that Mr. Carollo's claims were time-barred, the court explained that "[t]he injury here is the psychological problems associated with PTSD." Id. According to the court, Mr. Carollo's 2008 problems were not qualitatively different than the problems he had connected to his abuser's acts "as early as 1988" before his first PTSD diagnosis. Id. Although Mr. Carollo's injuries grew more severe, RCW 4.16.340(1)(c)"says nothing about quantity of harm." Id. Rather, "it speaks of 'injury' and connection of 'injury' to 'acts.' " Id. The court explained that RCW 4.16.340(1)(c) only restarts the limitations period "for different injuries discovered at different times rather than applying to more severe manifestations of a prior injury." Id.
It is instructive that the court in Carollo did not consider Mr. Carollo's new 2008 diagnoses of panic disorder, major anxiety, and major depressive disorder to be "qualitatively different" from his previous problems associated with PTSD. Id. at 1173, 1175. Nor did the court find that Mr. Carollo's "new symptoms, such as memory loss," warrant a finding that Mr. Carollo suffered a different injury for purposes of RCW 4.16.340. Id. at 1175. Thus, Dr. Kliman's assessment that "PTSD is not considered an anxiety disorder," that PTSD is "clearly differentiated" from depression, and that PTSD is not the same as "adjustment reaction disorder ... by a long shot" (Kliman Depo. at 86), does not compel a finding that A.T. suffered a "different injury" for the purposes of RCW 4.16.340(1)(c), see Carollo , 240 P.3d at 1175. To the contrary, according to A.T. to A.T., her symptoms reached their peak in *1257 2012, well before the PTSD diagnosis. (A.T. Depo. Vol. 1 at 7.)
In short, RCW 4.16.340(1)(c) does not halt a statute of limitations until a victim's long-present symptoms are given the proper name. Here, there is no genuine dispute of material fact that A.T. began suffering her injury at least by May 2013, at which point she had been diagnosed with Adjustment Disorder with Mixed Anxiety and Depressed Mood by three separate therapists. At most, A.T.'s PTSD is a quantitatively different injury for which the statute of limitations will not start anew.
A.T. also argues that her state claims should not begin to accrue until fall 2015 because that is the first time she made the causal connection between her injury and Mr. Verver's actions, after becoming "unusually hypervigilant" at two job fairs and suffering a panic attack. (1st Resp. at 12.) The undisputed facts, however, show otherwise. In the light most favorable to A.T., A.T. associated her problems with Mr. Verver's abuse by May 2013, at the latest.
A.T. sought counseling at UCLA in 2010 after a "significant reaction" while teaching an undergraduate French class. (1st Resp. at 9.) A.T. told the counselor about her relationship with Mr. Verver, and the counselor diagnosed A.T. with Adjustment Disorder with Mixed Anxiety and Depressed Mood. (Id. at 9-10.) A.T. also journaled in January 2012 that she felt "damaged by [the] relationship" with Mr. Verver. (Leitch Decl., Ex. C at 3.) In September 2012, A.T. told her PhD supervisor about Mr. Verver and that how, in 2009, she "realized the power dynamics that had been operation ... [and] had a really difficult time teaching that whole year." (Id., Ex. E at 3.) Also in September 2012, A.T. journaled that she "felt groomed and manipulated" by Mr. Verver. (Id., Ex. G at 3.) A.T. saw a second counselor at the end of September 2012, this time at Cambridge, to seek help after "getting out of a harmful relationship," that she "only just recently (like, for two months) allowed [herself] to think about this relationship as harmful." (Cambridge Counseling at 146.) A.T. additionally told the Cambridge counselor that her relationship with Mr. Verver "shuts [her] down fairly often," causing her to not get out of bed or eat for several days at a time. (Id. ) In spring 2013, after returning to the United States, A.T. again sought counseling at UCLA for "ongoing issues around an abusive relationship," and "Anxiety, fears, or nervousness ... Depression ... [and] Sexual abuse or assault." (Leitch Decl., Ex. I at 3.) A.T. last saw the UCLA counselor in May 2013, at which time the counselor noted that A.T. had symptoms of anxiety, depression, and difficulty concentrating. (Id., Ex. J at 3-4.)
On this undisputed evidence, the court finds that there is no genuine dispute as to any material fact that, by May 2013, A.T. made the causal connection between her injuries and Mr. Verver's alleged abuse.
A.T.'s facts are distinguishable from the cases she relies upon. (See 1st Resp. at 16-20 (citing Korst, 148 P.3d 1081 ; Holloman , 949 P.2d 386 ).) In Korst v. McMahon , for example, a woman sued her parents for harms caused by her father's rape when she was 13-years-old. 148 P.3d at 1082-83. In finding that the plaintiff's claims were timely, the court noted that, while the plaintiff had previously recognized that she resented her father for the abuse, she was not aware that the abuse had caused her the physical and emotional symptoms that she complained of in her suit. Id. at 1085. Here, by contrast, A.T. was aware of the injury that underlies this suit by May 2013, even if her injury now has a different name.
In Holloman v. Corcoran , the plaintiff sued his childhood abuser. 949 P.2d at 390.
*1258 Mr. Holloman was diagnosed with PTSD twice by two different counselors, once in 1989 and once in 1994. Id. at 389-90. The court found that Mr. Holloman's 1995 lawsuit was not time-barred because, even though he was diagnosed with PTSD more than three years prior to the lawsuit, Mr. Holloman did not connect the first diagnosis to the abuse. Id. at 392. Only during the 1994 diagnosis did Mr. Holloman make the causal connection between the abuse and his injury. In the present case, however, A.T. connected her harms to Mr. Verver's abuse by at least May 2013 when she saw her third therapist for harm related to Mr. Verver, noting specifically that she was seeking help for "ongoing issues around an abusive relationship." (Leitch Decl., Ex. I at 3.)
In sum, A.T. did not suffer a different injury in 2016 when she was diagnosed with PTSD stemming from symptoms that, according to A.T., reached their peak in 2012. (A.T. Depo. Vol. 1 at 7.) A.T.'s injury has remained the same for years even if she first received the PTSD diagnosis in 2016. Nor did A.T. first connect her injury to Mr. Verver's abuse at the job fairs in 2015. By May 2013, A.T. had seen three therapists for her injuries related to Mr. Verver's actions. At least by May 2013, A.T. made the causal connection between Mr. Verver's acts and her injury that forms the basis of her claims.
May 2013 is more than three years and 60 days before the October 22, 2016, effective filing date. Therefore, the court finds that A.T.'s state law negligence and negligent infliction of emotional distress claims are untimely.
2. A.T.'s Federal Claims are Untimely
Although state law "determines the length of the limitations period, federal law determines when a civil rights claim accrues." Lukovsky v. City and Cty. of S.F., 535 F.3d 1044, 1048 (9th Cir. 2008). Under the federal common law discovery rule, the limitations period for A.T.'s section 1983 and Title IX claims begin to accrue "when the plaintiff knows or has reason to know of the injury which is the basis of the action." Id. The parties do not dispute that the federal common law discovery rule applies to A.T.'s federal civil rights claims. (See Verver MSJ at 8; 1st Resp. at 25; 1st Reply at 10.)
For the reasons stated above, the court finds that there is no genuine dispute of material fact that, by May 2013, A.T. knew or had reason to know of the injury which is the basis of her federal claims. See supra § III.D.1; see also Lukovsky, 535 F.3d at 1048. Therefore, A.T.'s section 1983 and Title IX claims are also untimely. A.T., however, makes an additional argument regarding her federal claims' accrual that the court now addresses.
On August 9, 2017, A.T. deposed Sarah Kelsey, a teacher at Cascade High School when A.T. attended school there. (Cochran Decl. ¶ 7, Ex. F at 113.) Ms. Kelsey testified that she was aware that another teacher saw Mr. Verver "caressing" A.T.'s face in an "oddly intimate" way on the couch in Mr. Verver's classroom in the early 2000s. (Id. ) Ms. Kelsey reported this incident to then Principal James Dean at that time. (Id. ) Ms. Kelsey, however, did not know if Mr. Dean ever acted on her report. (Id. ) A.T. subsequently deposed Mr. Dean on November 14, 2017. (See Cochran Decl. ¶ 8, Ex. G.) In that deposition, Mr. Dean testified that he did not remember Ms. Kelsey telling him about the caressing incident, nor does he remember ever investigating Mr. Verver. (Id. at 123-24.)
Based on this information, A.T. argues that she only learned about the District's knowledge of Mr. Verver's abuse-and therefore its deliberate indifference-after deposing Ms. Kelsey and Mr. Dean. (See *1259 1st Resp. at 29); see also Reese v. Jefferson Sch. Dist. No. 14J , 208 F.3d 736, 739 (9th Cir. 2000) (holding a school district liable for damages under Title IX "only where it has 'actual knowledge' of the abuse"); Duvall v. Cty. of Kitsap, 260 F.3d 1124, 1139 (9th Cir. 2001) ("Deliberate indifference requires both knowledge that harm to a federal protected right is substantially likely, and a failure to act upon that ... likelihood."). A.T. appears to argue that the new information she learned from Ms. Kelsey and Mr. Dean should somehow restart the limitations period for her federal claims. (See 1st Resp. at 29.) To the extent that is A.T.'s argument, it is not correct.
The federal discovery rule focuses on "when the plaintiff knows or has reason to know of the injury which is the basis of the action." Lukovsky, 535 F.3d at 1048 (emphasis added). The rule does not, as A.T. suggests, focus on when the plaintiff learns that the "injury constitutes a legal wrong." Id. at 1049 (citing Oshiver v. Levin, Fishbein, Sedran & Berman , 38 F.3d 1380, 1386 (3d Cir. 1994) ). In other words, A.T.'s federal claims began to accrue when she knew or had reason to know of the injury that forms the basis of her federal claims, not when A.T. learned an additional fact about the District's alleged knowledge that would bolster her claims. Moreover, although A.T. may have found support for aspects of her claims through the discovery process, uncovering better evidence does not restart the statute of limitations for an already pleaded claim. See Wasco Prods., Inc. v. Southwall Techs., Inc., 435 F.3d 989, 991 (9th Cir. 2006) ("[F]ederal courts have repeatedly held that plaintiffs seeking to toll the statute of limitations on various grounds must have included the allegation in their pleadings; this rule applies even where the tolling argument is raised in opposition to summary judgment.") (collecting cases).
Thus, the court finds that there is no genuine dispute of material fact that A.T. knew or had reason to know of the injury which forms the basis of her federal claims by May 2013. May 2013 is more than three years before A.T. filed her federal claims on September 30, 2016. A.T.'s federal claims are therefore untimely.
IV. CONCLUSION
For the foregoing reasons, the court GRANTS the District's first motion for summary judgment (Dkt. # 57) and GRANTS Mr. Verver's motion for summary judgment (Dkt. # 61). The court also DENIES the District's second motion for summary judgment (Dkt. # 59) as moot. Accordingly, the court dismisses this case with prejudice.

The court previously granted A.T. permission to proceed under a pseudonym. (MTD Order (Dkt. # 27) at 2 n.3.)

The court is aware that A.T. now goes by a different first name and uses the pronouns "they" and "them." (See, e.g., Leitch Decl. (Dkt. # 58) ¶¶ 6, 14, Ex. D at 19, Ex. L at 3.) For consistency and clarity, the court refers to A.T. as "her" and "she."

October 22, 2016, is a Saturday. A.T. would have been permitted to commence this action on Monday, October 24, 2016, the next court day. Fed. R. Civ. P. 6(a)(3). But the statute of limitations is extended only for "the sixty calendar period" after the claim has been presented, making October 22, 2016 the appropriate date. RCW 4.96.020(4).

A.T. does not argue that the court should apply RCW 4.16.340(1)(a), which starts a limitations period when the act that caused the injury occurred. Nor does A.T. argue that 4.16.340(1)(b) applies, which "addresses repressed memory claims where the victim discovers his or her injury or condition was caused by a previously undiscovered act." Hollmann v. Corcoran, 89 Wash.App. 323, 949 P.2d 386, 392 (1997). A.T. does not allege that she repressed her memory of the acts with Mr. Verver.